hAMY, Judge.
The claimant in this workers’ compensation matter contends that he was injured in a work-related accident and was denied the choice of an orthopedic surgeon. He further contends that he remains disabled and seeks indemnity benefits. The workers’ compensation judge concluded that the claimant was denied his choice of specialist. Penalties and attorney’s fees were awarded for this denial. The claimant was also awarded temporary and total disability benefits from the date the employer terminated his employment. The employer filed the instant appeal, from which the claimant answered. For the following reasons, we affirm.
Factual and Procedural Background
The claimant, James M. Skelton, contends that, in April 1997, he sustained an injury to his shoulder as he was working in the stud mill at Hunt Forest Products in Natalbany, Louisiana. He described the injury as feeling like his shoulder was “on fire.” Mr. Skelton testified that, although he told a coworker about the accident at the time it occurred, he did not report it to his employer until the next morning. Mr. Skelton, who continued to work, first came under the care of Dr. Ted Hudspeth, a family practitioner. Dr. Hudspeth’s diagnosis was that of a right shoulder strain of the deltoid and biceps with impingement. Mr. Skelton was released to return to light-duty work. He returned to work and was able to perform at this level.
Although he continued to work at modified duty through early summer and continued treatment with Dr. Hudspeth and physical therapy prescribed by the family practitioner, the claimant alleges that he re-injured his shoulder while at work. He testified that, even though he was supposed to be working at a light duty position, he was moving logs from a bin at the time of the alleged re-injury. Although *1218 the source of the referral is at issue in this case, Mr. Skelton came under the care of Dr. J.L. Fambrough, an orthopedic surgeon. Dr. Fambrough first examined the claimant on July 28, 1997, and determined that the claimant’s history and the physical findings |?on exam were consistent with impingement syndrome. After an injection, Mr. Skelton’s condition appeared to have improved.
Mr. Skelton was referred to Dr. Robert Brennan, an orthopedic surgeon, in September 1997. Dr. Brennan reported that, at that time, Mr. Skelton was still performing light-duty work. X-rays taken at the time of the initial visit revealed an acromial bone spur. Dr. Brennan’s diagnosis was right shoulder impingement syndrome/bursitis. On September 23, 1997, Dr. Brennan performed an arthroscopy in order to minimize the bone spur. The claimant continued under Dr. Brennan’s care and continued to complain of pain. On December 12, 1997, Dr. Brennan released the claimant to return to “Stage I” work for six to eight hours a day. By January 1998, Dr. Brennan determined that the claimant had reached maximum medical improvement and, by the end of January 1998, determined that the claimant could perform “Stage II” work. In March 1998, the claimant returned to Dr. Brennan stating that he had attempted to work eight hour days, but that he was unable to do so.
Also in March 1998, Mr. Skelton sought treatment from another orthopedic surgeon, Dr. Manale, who removed him from work completely for a period of several weeks. The employer denied knowledge of this report. When Mr. Skelton did not return to work as requested in April 1998, his employment was terminated. Mr. Skelton has subsequently obtained treatment from Dr. Manale and the Veterans Administration Medical Center.
The instant matter was filed in February 1999. In addition to the claimant’s pursuit of continued indemnity benefits, the claimant alleged that he was denied his choice of specialist, Dr. Manale. Following a hearing, the workers’ compensation judge found in favor of the claimant concluding that Mr. Skelton was denied his choice of physician and that he was entitled to penalties and attorney’s fees for this ladenial as well as reimbursement for expenses incurred due to the examination by Dr. Manale. Further, the workers’ compensation judge determined that Mr. Skelton was entitled to temporary and total disability benefits from March 26, 1998, the date of the examination by Dr. Manale, and “continuing until such time as there may be a change in his medical or disability status which would warrant a modification of this award.”
Hunt appeals, assigning the following as error:
A. The workers’ compensation judge’s ruling that appellee did not select a choice of physician and granting penalties and attorney’s fees was clearly wrong and manifestly erroneous.
B. The workers’ compensation judge’s ruling that appellee was entitled to temporary total disability benefits was clearly wrong and manifestly erroneous.
C. The workers’ compensation judge’s ruling that the need for a functional capacities evaluation was requested by the medical case manager was clearly wrong and manifestly erroneous.
D. The workers’ compensation judge’s ruling that appellee was entitled to reimbursement of medical expenses for a third orthopedic surgeon is clearly wrong and manifestly erroneous.
*1219 Mr. Skelton has answered the appeal, seeking an increase in the sums awarded, penalties and attorney’s fees for the termination of benefits, and attorney’s fees for defense of what he terms a frivolous appeal.
Discussion

Choice of Physician

Hunt first contends that the trial court erred in concluding that Mr. Skelton was denied his choice of specialist. Rather, it argues that the evidence indicates that Mr. Skelton chose an examination by Dr. Hudspeth, a family practitioner, and that Dr. Hudspeth then referred him to Dr. Fambrough, an orthopedic surgeon. In turn, Dr. Fambrough referred Mr. Skelton to Dr. Brennan. Thus, according to Hunt, Mr. Skelton had two orthopedic surgeons of his choice. The employer points to Choice |4of Physician Forms contained in its records with Mr. Skelton’s signature indicating that the two orthopedic surgeons were his choice of physicians and denials from workers’ compensation carrier personnel at trial that these physicians were the employer’s choice. In the least, Hunt contends, Mr. Skelton received numerous treatments from the two orthopedic surgeons rendering them his defacto choices of physicians. Hunt argues that the workers’ compensation judge’s conclusion otherwise, in the face of this evidence, is manifestly erroneous. Further, it asserts that, because of this erroneous determination, the $2,000 penalty and $2,500 in attorney’s fees awarded for the failure to provide Mr. Skelton with his choice of physician must also be reversed.
La.R.S. 23:1121(B) provides:
B. The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain pri- or consent from the employer or his workers’ compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
In finding that Hunt denied the claimant his choice of physician, the workers’ compensation judge reviewed the conflicting evidence regarding the selection of the orthopedic surgeons. The workers’ compensation judge explained that he made no finding regarding whether the claimant or the employer chose the initial treatment by Dr. Hudspeth, but went on to discuss the specialists in orthopedics, stating:
However, with respect to Doctor Famb-rough, the Court has reviewed again all of the documents submitted by both parties. The Court notes that on July 16th, 1997 Doctor Hudspeth’s plan was that Mr. Skelton needed to consult an ortho-paedic surgeon. Doctor Hudspeth names no orthopaedic surgeon.
In documents submitted by the Defense with respect to choice of ortho-paedic doctors, it’s noted in the exhibit attached to Doctor Hudspeth’s deposition, handwritten notes from Doctor Hudspeth’s office where it states on July 18th, '97 they asked Ms. Penny Crawford about Mr. Skelton seeing an ortho-paedic, and they were told by Ms. IsCrawford to contact Mary Francis Hamsa. Doctor Hudspeth’s office did not name an orthopaedic to Ms. Penny Crawford.
On July 21st, 1997 the hand notes reflect that there was a telephone conference with Mr. Skelton where he was inquiring about an orthopaedic doctor, again no orthopaedic doctor was men *1220 tioned to Mr. Skelton. The hand notes reflect that on July 22nd, 1997 Mary Hamsa called back to Doctor Hudspeth’s office and told Doctor Hudspeth’s office that Mr. Skelton would be approved to see Doctor McCaffey, and that she was going to make the appointment and call Mr. Skelton. The Court was in question about who Doctor McCaffey was since there was no evidence or testimony presented by Doctor McCaffey. Upon review of the records the Court determined that Doctor McCaffey and Doctor Fambrough were in a practice — medical practice together. Contrary to the testimony of the Employer and the third-party administrator, the Court finds [ ] Doctor Fambrough to be the orthopaedic choice for the Employer. Doctor Fambrough then referred the Claimant to Doctor Robert Brennan, Doctor Robert Brennan is likewise the orthopaedic of choice-a second orthopaedic of choice for the Employer.
The Court would note for the record in the deposition, exhibit D-2, of Doctor Hudspeth on page forty-four, lines thirteen through eighteen, Doctor Hudspeth was questioned about his involvement in the choice of orthopaedic surgeons, the question asked to [ ] Dr. Hudspeth was, did you have any involvement in the choice of orthopaedic surgeon that Mr. Skelton went to see. His response was, no, that’s strictly up to whoever the insurance says they go to and that kind of thing. The Court finds the Employer was unreasonable in the use of the medical case manager and unreasonable in their denial of Mr. Skelton’s right under the workers’ compensation law to see an orthopaedic of his choice, despite the fact that the Employer had Mr. Skelton sign choice of orthopaedic forms. The Court finds it was simply a masquerade or a charade perpetrated on Mr. Skelton by the selection of physicians and then having the physicians’ offices tell Mr. Skelton where he was going to be examined, and thereby covering up or failing to disclose that the doctors were actually being chosen by the case nurse manager. For their unreasonableness in denying Mr. Skelton his right to an ortho-paedic of his choice, the Court issues a two thousand dollar penalty and a twenty-five hundred dollar attorney fee.
Our review of the record reveals support for the many factual findings of the workers’ compensation judge. In addition to resolving pure factual issues, much of the above-discussion reveals credibility determinations, appropriate only at the trial court level. For example, the employer points to the Choice of Physician Forms apparently signed by Mr. Skelton and workers’ compensation personnel who denied that the employer was involved in the selection of Dr. Fambrough and Dr. Brennan. However, the Informs were found to be a “masquerade” or “charade” and the testimony discounted by the workers’ compensation judge. Elsewhere in the reasons for ruling, the workers’ compensation judge stated: “The Court believes the testimony of Mr. Skelton, he was forthright, sincere and honest throughout the course of the trial with respect to all of his testimony, it is corroborated by all of the documents submitted into evidence.” This type of credibility determination is not to be second-guessed at the appellate level.
We next consider the employer’s contention that, even if the orthopedic surgeons were not Mr. Skelton’s choice, they became his de facto choice of specialist due to his long-term treatment by both physicians. In support of this argument, the employer points to a number of cases wherein an employer’s choice of physician was treated as the employee’s choice for purposes of La.R.S. 23:1121 due to acquiescence in the treatment of that physician.
*1221 In the majority of the cases cited by the employer, however, the appellate court was faced with a trial court’s factual determination that a physician became an employee’s de /acto choice. See Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir. 5/31/95); 657 So.2d 449; Guillotte v. Dynamic Offshore Contractors, 93-335 (La.App. 3 Cir. 12/8/93); 628 So.2d 234. See also Shaw v. Alfred Miller General & Masonry Contractor, 98-688 (La.App. 3 Cir. 12/9/98); 725 So.2d 520, writ denied, 99-0264 (La.3/26/99); 739 So.2d 800. We are not faced with that situation in this case. Rather, the workers’ compensation judge made a specific finding of fact that Dr. Fambrough and Dr. Brennan were physicians chosen by the employer. Additionally, the workers’ compensation judge was aware of Mr. Skelton’s testimony that he had objected to treatment from these physicians, but that l7he was told it was the only treatment that would be provided.[1] Again, the workers’ compensation judge found Mr. Skelton’s version of events credible.
With the presence of evidence supportive of the workers’ compensation judge’s specific findings of fact and credibility determinations, we do not find that this case is one requiring a finding that the orthopedic surgeons were the claimant’s de facto choice of specialist. Neither is there error in the workers’ compensation judge’s determination that penalties and attorney’s fees are appropriate for the denial of the claimant’s choice of physician.
This assignment is without merit.

Temporary Total Disability Benefits

The employer next contends that the workers’ compensation judge erred in awarding temporary total disability benefits from March 26, 1998, the date Dr. 1 sManale gave the claimant a release from work. Hunt contends that the claimant failed to prove, by clear and convincing evidence, that he is unable to work. It asserts that the objective medical evidence offered at trial demonstrates Mr. Skelton’s ability to work. In particular, it points to Dr. Brennan’s determination, as early as January 1998, that Mr. Skelton had reached maximum medical improvement and could return to work. The MMI status and the ability to work, at least at some level, was confirmed on a number of occasions prior to Mr. Skelton’s termination. Hunt also contends that, all of the MRI’s performed up to that time, revealed no rotator cuff tear, a condition later revealed in testing at the VA Medical Center.
La.R.S. 23:1221(1)(C) provides for recovery of temporary total disability benefits in *1222 the event a claimant can prove, by “clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment....” This court has previously determined that a claimant seeking TTD benefits must introduce objective medical evidence in order to satisfy the “clear and convincing evidence” burden of proof. Jackson v. Domtar Industries, Inc., 98-1335 (La.App. 3 Cir. 4/7/99); 732 So.2d 733, writ denied, 99-1369 (La.7/2/99); 747 So.2d 21; Comeaux, 94-1631; 657 So.2d 449.
In finding Mr. Skelton entitled to TTD benefits, the workers’ compensation judge explained:
Mr. Skelton, subsequent to being terminated from Hunt Forest Products, went to the Pain Management Center, first seen there on July 8th, 1998 and was seen for a total of nine times through March 30th, year 2000, and on every occasion Mr. Skelton complained about his shoulder and received medication, pain medications, to alleviate the problems with his shoulder. When he saw Doctor Manale on March 26th, 1998 Doctor Manale’s examination revealed clinical evidence of pericapsulitis. That’s contained in exhibit P-2. In exhibit P-10 Doctor Manale had seen the Claimant on November 10th, 1999, he reviewed — by this time Mr. Skelton had had an MRI done at the VA Hospital. Doctor Manale had reviewed that MRI finding from the VA Hospital, Doctor Manale concluded that the MRI of the right shoulder was reported as showing |sa moderate to severe thinning of the supraspinatus tendon with a small rota-tor cuff tear. Exhibit P-11, the records from the VA Medical Center reflect that Mr. Skelton first went there complaining about his shoulder problems on August 5th, 1998. On a visit there on September 3rd, 1998 the physicians at the VA Medical Center stated that Claimant was not ready to return to his previous work. On April 2nd, 1999 the medical providers at the VA Medical Center stated that the Claimant was at risk for damaging his shoulder capsule due to scapular immobilization. The Court notes that throughout the course of treatment of Mr. Skelton every physician was concerned about the immobility of the Claimant’s right shoulder. He returned to the VA on May 27th, 1999 for follow-up of adhesive capsulitis to his right shoulder. An MRI was performed at the VA Medical Center June 28th, 1999; as the Court previously stated, was reviewed by Doctor Manale. Finding, a moderate to severe thinning of the supraspinatus tendon with small rotator cuff tear. The Court is inclined to give greater weight to the positive medical findings rather than the negative findings of the previous MRIs, since every physician who saw Mr. Skelton from the initial physician was very concerned that he had a rotator cuff tear, and this has now been confirmed by the MRI performed at the VA Medical Center.
The Court finds that Mr. Skelton has borne his burden of proof by preponderance of the evidence in establishing that he sustained a work accident with the Employer on April 19th, 1997, and that as of March 26th, 1998 he was temporarily totally disabled and entitled to receive temporary total disability benefits from that date forward based upon the positive medical findings of the subsequent physicians, the physicians which the Employer had failed to investigate, despite the fact that they were aware of those physicians. In particular there was information obtained by the attorney for the Employer in July of 1999 *1223 that let them know specifically the medical findings of Doctor Manale, and they failed to investigate those findings, simply saying to the Court, well, he had his choice of physician and he cannot have another choice of physician, you need to ignore those reports, Court....
The temporary total disability benefits awarded to Mr. Skelton from the date his benefits were terminated, or from March 26th of 1998 are at the rate of two hundred forty-nine dollars and ninety-seven centers per week....
As observed above, objective medical evidence of the claimant’s injury is revealed by examinations from Dr. Manale as well as treatment obtained at the VA Medical Center. In particular, an MRI performed at the VA Medical Center in June 1999 revealed “[mjoderate to severe thinning supraspinatus tendon with small rotator cuff[.]” In addition to this objective medical evidence, reports from physicians |inalluded to the claimant’s inability to work. Prior to this final MRI and following a March 26, 1998 examination, Dr. Manale reported:
Unable to make a clear cut diagnosis today. The man has clinical evidence of perieapsulitis, but I am uncertain of the underlying pathology. I would advise him not to engage in strenuous physical activity until some break comes along and we can find out more about what is going on. Naturally, I am at a disadvantage not having Dr. Brennan’s operative report and/or photographs if they were taken.
At the end of the report is the following notation: “DISABILITY STATUS: TOTAL TEMPORARY 3/26/98 TO 4/20/98[.]” It is during this period that Mr. Skelton’s employment with Hunt was terminated. In September 1998, a handwritten report after an examination at the VA Medical Center reveals that the physician stated: “In my opinion vet is not ready to return to previous work.” Finally, after an October 1999 examination, Dr. Manale reported:
RECOMMENDATION: I told this man that I really need to get additional information, especially from any of the doctors who did surgery before I can decide what to do.
In the meantime, I am sort of at a loss as to how to help this man. I am uncertain what to tell him to do. He appears to have significant dysfunction of the shoulder, but I don’t know what to do to improve it, at least with the information available to me at his time.
DIAGNOSIS: PERICAPSULITIS, TRAUMATIC ARTHRITIS SHOULDER, POSSIBLE IMPINGEMENT SYNDROME
We do have some records from the VA Hospital. The MRI of the right shoulder is reported showing moderate to severe thinning of the supraspinatus tendon with a small rotator cuff tear. Anterior labrum intact.
Finally, Mr. Skelton testified that, although he wanted to return to work, there was no work that he could perform.
Although this is not a flawless record with regard to disability as the physicians’ statements as to the claimant’s ability to work do not alone evidence an uninterrupted timeline of disability, the workers’ compensation judge found Mr. Skelton satisfied the burden of proof required for recovery of temporary total disability benefits. This determination is supported by objective medical evidence, reports from physicians regarding the claimant’s disability, and his own lay testimony | n regarding his ability, or lack thereof, to work. Given this type of evidence, we find no reversible error in the workers’ compensation judge’s determination.
This assignment lacks merit.

*1224
Recommendation for Functional Capacity Evaluations

At the hearing, the employer pointed out that functional capacity evaluations were scheduled and that Mr. Skelton did not attend. The workers’ compensation judge determined that the nurse case manager recommended the FCE. In its third assignment of error, Hunt contends that this determination was manifestly erroneous. It points to Dr. Brennan’s deposition testimony wherein he states that he felt that an FCE was required due to a discrepancy between what he found on exam and what Mr. Skelton was reporting in terms of continued complaints of pain. This testimony, Hunt contends, “leaves no question that there was no reasonable factual basis for the trial court to conclude that the need for a functional capacities evaluation was requested by Mary Frances Hamsa, the nurse case manager.”
The workers’ compensation judge stated:
There was question about Mr. Skelton attending a functional capacity evaluation and testimony that Doctor Brennan wanted that functional capacity evaluation, however a further review of the records discloses that it was Mary Francis Hamsa who suggested to Doctor Brennan the need for a functional capacity evaluation. The Defendants rely upon a letter attached to-as an exhibit to Doctor Brennan’s deposition dated March 17th, 1998 where Doctor Brennan states patient needs an FCE. However, on a notation dated March 16th, 1998 Doctor Brennan states, after talking to Mary Hamsa, the patient is going to go for a functional capacity evaluation. A lot of evidence was presented that Mr. Skelton refused to comply with the functional capacity evaluation, however there are records showing that the initial place of-the initial location which scheduled the functional capacity evaluation for the Claimant was a place that the Claimant was willing to go to and made known to all parties that he was willing to have a functional capacity evaluation at that place. He testified throughout the trial, and the Court believes throughout the course of his treatment that he was uncomfortable with the initial physical therapist because they caused him harm during his physical therapy procedure, probably because they were unaware of the Bankhart lesion. The Court finds in a hand note from Doctor Hudspeth’s office on a service date of April 22nd, 1997 that it was Hunt Plywood Products who on May 5th, 1997 chose North _|_1gOaks, the physical therapy center. It was a physical therapy center originally scheduled in Baton Rouge, Louisiana to do the functional capacity evaluation that Mr. Skelton was willing to go to. The employer and the third-party administrator refused to allow Mr. Skelton to have an FCE at this facility in Baton Rouge and insisted on North Oaks.
MR. OUBRE: Is that North Oaks, Judge, or Affiliated?
THE COURT: North Oaks is the original physical therapy place that treated Mr. Skelton from the beginning of his injury. I think the record reflects that Affiliated in Baton Rouge is where the FCE was originally scheduled and canceled by Mary Hamsa, who said the Claimant was returned to the Hammond facility, North Oaks.
Again, our review of the record reveals no manifest error in the workers’ compensation judge’s factual finding. As pointed out in the employer’s brief, Dr. Brennan testified that, as of the March 16, 1998 visit, he felt that Mr. Skelton could work an eight-hour day, whereas Mr. Skelton felt that he could not. He testified that: “At this point, because there’s a discrepan *1225 cy, we sent him for a functional capacity evaluation.” This type of testimony, the employer contends, precludes a finding that it was Ms. Hamsa who actually requested the FCE. We disagree.
It is clear that Dr. Brennan’s notes indicate that an FCE was prescribed by Dr. Brennan. However, what the workers’ compensation judge concluded is that he was requested to do so by Ms. Hamsa. As referenced by the workers’ compensation judge, in a Status Report to workers’ compensation personnel dated March 16, 1998, Dr. Brennan writes, in part: “The patient states he cannot work 8 hours per day at Stage II. I believe the patient can do Stage II 8 hours per day. After talking to Mary Hamsa the patient is going to go for a Functional Capacity Evaluation.” (Emphasis added.) Certainly, Dr. Brennan’s deposition remarks were sufficiently ambiguous and open to interpretation in light of this note that the workers’ compensation judge could conclude that the decision to require an FCE for the claimant was not Dr. Brennan’s alone. Accordingly, we find no manifest error in this finding.
| iaReimbursement for Dr. Manale’s Examination
Finally, the workers’ compensation judge ordered the employer to reimburse Mr. Skelton for $102.00 in expenses incurred from his March 26, 1998 examination by Dr. Manale. In its final assignment of error, Hunt contends that by doing so, the workers’ compensation judge effectively permitted examination by Mr. Skelton’s third choice of orthopedic surgeon. This argument is simply a reassertion of the first assignment of error regarding the determination that Mr. Skelton had been denied his choice of specialist. We do not address it again here.

Claimant’s Answer

Mr. Skelton filed an answer to this appeal asking for a modification of the judgment increasing the amount of “damages,” penalties, and attorney’s fees. He also asks the court for additional attorney’s fees for filing a frivolous appeal. In his brief to this court, however, the claimant makes a very limited argument as to his contentions in the answer. He appears to primarily contend that the workers’ compensation judge placed insufficient weight on evidence indicating that the employer was aware that he had undergone subsequent medical testing and that there was insufficient investigation.
In denying penalties and attorney’s fees, the workers’ compensation judge concluded that, although the employer may have been informed of the claimant’s visit to Dr. Manale prior to his termination, the actual medical records available were limited to those from the orthopedic surgeons who had been treating Mr. Skelton. The workers’ compensation judge stated:
It would appear at this time that the termination of workers’ compensation benefits was not arbitrary and capricious because at the time of termination of benefits the only medical evidence available to the Employer were the records of Doctor Hudspeth, Doctor Fambrough and Doctor Brennan, in particular Doctor Brennan had released Mr. Skelton to return to some form of work with the Employer, and there was no testimony that the job offered by the Employer at that time was |uoutside of the restrictions placed upon Mr. Skelton by Doctor Brennan.
The reasons for ruling continue with the workers’ compensation judge’s conclusion that, after termination, workers’ compensation personnel became aware that additional medical records existed and that no attempts at investigation were made.
*1226 As pointed out by the trial court, at the time of termination of benefits, the employer was in receipt of a medical opinion from a long-time treating physician that Mr. Skelton could return to work. While the workers’ compensation judge went on to find that the matter was inadequately investigated later, we do not find, in the presence of the evidence of the ability to work, that the workers’ compensation judge’s denial of penalties and attorney’s fees was an abuse of discretion.
The remainder of the modifications sought in the answer have apparently been abandoned by the claimant as he does not address them in his brief. Accordingly, pursuant to Rule 2-12.4 of the Uniform Rules, Courts of Appeal, these arguments are not addressed.
DECREE
For the foregoing reasons, the decision of the Office of Workers’ Compensation is affirmed. Ml costs of this proceeding are assigned to the defendant, Hunt Forest Products.
AFFIRMED.

. With regard to the referral to Dr. Famb-rough, the transcript contains the following colloquy between Mr. Skelton and his counsel:
Q Well, did [Dr. Hudspeth] refer you to a-any-Doctor Fambrough?
A I guess he did.
Q Okay.
A I don't know how — all I know is I was told to go to him.
Q By who?
A By worker's comp and Hunt Plywood.
Q Okay.
A Because when I-I had asked Hunt Plywood about it and they said, we're not in control, it's workmen's comp. Called pay — Penny Crawford and come to find out that she was telling me that this is who we're going to pay for and if you want somebody different then you pay for it.
Similarly, with regard to treatment by Dr. Brennan, Mr. Skelton testified:
I called workman's comp and told them I did not feel comfortable with him. I had no choice, they — they—that's who they were going to pay for and that's who I ended up with. It was either that or me having to pay for it and I couldn't afford it.
Q Okay. So you didn't choose Doctor Brennan?
A No, I did not.